Helen L. COOLEY, William O. Cooley, and the 7C Company, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–413L.

United States Court of Federal Claims.

April 28, 2000.

Jerry Stouck, Spriggs & Hollingsworth, Washington, D.C. for plaintiffs. Paul V. Waters, Joel A. Fischman and Jonathan B. Bender, Spriggs & Hollingsworth, Washington, D.C., of counsel.

Thomas L. Halkowski and Susan V. Cook, General Litigation Section, Environment &

Natural Resource Division, U.S. Department of Justice, Washington, D.C., with whom was James E. Brookshire, Deputy Chief, General Litigation Section for defendant. Steven P. Adamski, St. Paul District Counsel's Office, U.S. Army Corps of Engineers, St. Paul, Minnesota, of counsel.

## OPINION

SMITH, Chief Judge.

This case is before the court on plaintiffs' claim for just compensation under the Fifth Amendment for the regulatory taking of real property. Plaintiffs' claim is based upon the denial of an application for a wetlands fill permit under § 404 of the Clean Water Act, 33 U.S.C. § 1344 (1993)(CWA)[1]. For the reasons stated below, the court finds for the plaintiffs.

## FACTS

Plaintiffs, Helen L. Cooley, William O. Cooley, and the 7C Company, purchased a thirty-three acre parcel of land located at the Northwest intersection of Highway 10 and Hanson Boulevard in Coon Rapids, Minnesota in March 1972 for approximately $146,500. The purchase used a form of seller financing known in Minnesota as a "contract for deed," a transaction that functions like a mortgage.

Plaintiffs planned to develop the property from raw land to a state suitable for improvements by adding roads, parking areas, and utility hookups. Then, plaintiffs intended to subdivide the property and sell portions to others who would build structures on the property. At the time plaintiffs purchased the land in 1972, the land was shown on the city land use plan as "future commercial" property. Plaintiffs, however, did not commence immediate development of the subject property after its purchase. After plaintiffs purchased the property, the federal government enacted regulations that prohibit owners of property classified as "wetlands" from taking any action to develop such property unless they first obtain a § 404 permit from

---

1. Pub.L. No. 92–500 § 2, 86 Stat. (Oct. 18, 1972), amending the Federal Water Pollution Control Act, codified as amended at 33 U.S.C. § 1344 (1994).

the Army Corps of Engineers pursuant to the Clean Water Act.

On April 27, 1976, a quitclaim deed was executed transferring plaintiff 7C Company's interest in the subject property to Jim and Alice Fenning. A quitclaim deed dated May 1, 1976 transferred the interest in the subject property back to plaintiffs. The May 1, 1976 quitclaim deed was not recorded until 1980. At various times after 1972, plaintiffs negotiated with local authorities to obtain approval to develop the property. In 1980, the plat and the plaintiffs' planning and development were approved, but plaintiffs did not begin to develop. Plaintiffs resubmitted their development plans and obtained the required planned unit development or "PUD" approval from local authorities in 1990.

Late in 1989, plaintiffs sought a determination from the Army Corps of Engineers as to whether development of their property would require a § 404 fill permit. By a letter of February 2, 1990, the Corps asserted that approximately the entire site was wetlands and, thus, subject to its CWA jurisdiction. Plaintiffs initially contested the Corps' CWA jurisdiction, arguing that the wetlands at the property were degraded. The Corps of Engineers rejected that argument, and on March 24, 1992, plaintiffs applied for a § 404 permit to fill approximately twenty-six acres of wetland. On May 8, 1992, the Corps issued a notice soliciting comments from the public on plaintiffs' application. Plaintiffs responded to the concerns addressed in each comment. On September 8, 1992, the Corps of Engineers sent plaintiffs a written request for additional information on alternative sites for plaintiffs' project. Plaintiffs responded with more information on September 30, 1992. On February 25, 1993, the Army Corps of Engineers denied plaintiffs' application for a § 404 permit. Plaintiffs filed this action for just compensation in July of 1993.

After plaintiffs initiated this litigation, Mr. Ben Wopat, Regulatory Branch Chief for the Corps' St. Paul, Minnesota, District Office, sent plaintiffs a letter dated December 14, 1993, which suggested the Corps might be willing to issue a permit for a narrower scope project and invited plaintiffs to provide additional information on economic data relating to the minimization requirement. Plaintiffs' counsel then sent a letter to defendant stating that the permit process was not ongoing. The letter also stated that plaintiffs would consider settlement of the case if the Corps granted the previously denied permit.

On its own initiative, the government then did an alternatives analysis on plaintiffs' proposed site. The government also addressed the minimization issue through communications between Corps headquarters and the St. Paul District Office. The government's appraiser concluded that a reduced scope would allow a reasonable profit on the project. Pursuant to that appraisal, the Army Corps of Engineers issued a "permit" on April 8, 1996, authorizing development of approximately fourteen acres of the property. The Corps also applied for and obtained a Minnesota state water quality approval under § 401 of the CWA for the new "permit." Plaintiffs rejected this partial "permit." Corps officials in the St. Paul District Office then sought guidance from Corps' headquarters on the proper interpretation of the § 404 permitting process guidelines. The St. Paul Corps' officials, including Mr. Wopat and Mr. Fell, the Corps' project manager responsible for handling plaintiffs' permit application, did not believe they could lawfully issue a § 404 permit for the entire subject property under the permitting guidelines as they understood them.

In response to its requests for guidance, the Corps' St. Paul District Office received a memorandum from Mr. Lance Wood (Wood Memorandum), Assistant Chief Counsel for Regulation on July 26, 1996. The Wood Memorandum stated that the subject property consisted of degraded wetlands, as the plaintiffs had previously argued in 1990. The Wood Memorandum concluded that because the wetlands on the subject property were degraded, avoidance and minimization criteria were not applicable or necessary if plaintiffs provided mitigation. The Wood Memorandum also explicitly stated that its interpretation of the § 404 guidelines was project specific and would not apply to any other application. Mr. Michael Davis, Deputy Assistant Secretary of the Army adopted the Wood Memorandum as consistent with

official government policy. The Corps' St. Paul District Office issued another "permit" for plaintiffs to develop the entire property on July 26, 1996, the same day the St. Paul office received a copy of the Wood Memorandum. This was also the same day the government filed its trial brief, ten days before the August 6, 1996 commencement of trial.

## DISCUSSION

In addition to the normally difficult questions involved in a claim based upon a taking by regulatory action, this case presents a novel additional issue. Can the United States, by issuing the earlier denied permit, shortly before trial and through procedures that apparently have only been used in this case, and involve the likelihood of a substantial Administrative Procedure Act [2] (APA) challenge by third parties, divest the plaintiff of its cause of action for a taking under the Fifth Amendment? [3] Under our Tucker Act jurisdiction, this court may not rule on whether the Corps' denial of a permit was arbitrary and capricious, nor can the court declare an issued permit valid or invalid. *See Bowen v. Massachusetts*, 487 U.S. 879, 905, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) ("'[T]he Court of Claims has no power to grant equitable relief.'") (quoting *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973)); *Glidden Co. v. Zdanok*, 370 U.S. 530, 557, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) ("From the beginning [the court] has been given jurisdiction only to award damages, not specific relief."); *see also James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998); *Southfork Systems, Inc. v. United States*, 141 F.3d 1124, 1135 (Fed.Cir. 1998). However, the court has a duty to determine whether, in litigation before it, a claim that property has been taken is true and if so, what compensation is due under the Fifth Amendment. In so doing, the court may not question the validity or invalidity of the government action alleged to have taken the property. *See Bowen*, 487 U.S. at 905, 108 S.Ct. 2722; *Richardson*, 409 U.S. at 465, 93 S.Ct. 629.

While this limitation is sometimes phrased that the court must accept as a given that the regulatory action is proper, it can be more clearly articulated that the court need not inquire into whether the government action violated the APA, for example, because by coming to this court the plaintiff has waived the challenge and seeks compensation rather than a restriction on government action. *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1365 (Fed.Cir.1998) (stating that when a plaintiff brings a takings claim in this court, he must "concede the correctness of the government action that is alleged to constitute the taking."); *see also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993); *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 899 (Fed.Cir.1986). The old common law doctrine of waiving the tort and suing on the contract is analogous. This rule reflects the decision made by Congress to allocate procedural challenges to agency actions to the district courts and challenges for a taking and just compensation to this court and the Court of Appeals for the Federal Circuit. *Compare United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (holding that 28 U.S.C. § 1491 [the Tucker Act] is limited to claims for monetary compensation), *and Bowen*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), *with* 5 U.S.C. § 702 (1996), which vests claims for nonmonetary relief in the U.S. district courts.

In this case, however, the court is faced with a government argument that it has issued a valid permit for the full property and therefore any taking that may have occurred is now reversed. In order to determine whether there is still a taking, the court must, among other things, determine whether the government has indeed issued a permit. Thus, the court inquires whether the permit action on the eve of trial restored plaintiffs' property, assuming a taking had occurred. It must also determine whether plaintiff is obligated to accept this "permit."

**2.** 5 U.S.C. §§ 551–59, 701–06 (1996).

**3.** U.S. Const. amend. V. The Takings Clause of the Fifth Amendment provides "nor shall private property be taken for public use without just compensation." *Id.*

Stated another way, after an owner has been deprived of its property, must it accept the return of the property even though time and circumstances have put it in a different position and acceptance may be subject to legal challenge by third parties?

## I. Jurisdiction

The jurisdiction Congress granted this court under the Tucker Act is generally limited to claims for money damages against the federal government. Defendant claims this court may not grant relief to plaintiffs because such relief would be equitable, effectively invalidating the 1996 permits, and that plaintiff must concede the validity of the 1996 permits in any event.

### A. Whether This Court May Rule on the Validity of the 1996 Permits

The simple response to defendant's concern is that determining the validity of the 1996 permits is not at issue. What is at issue is whether after an earlier taking, if it occurred, the government may require plaintiff to accept a new permit not applied for and issued with certain procedural irregularities. The primary issue in dispute is whether the 1993 permit denial was a compensable taking?

It is undisputed that this court has jurisdiction to determine whether an agency decision is a final agency action. The examples of such rulings are common. *See, e.g., Heck v. United States,* 37 Fed.Cl. 245, 250 (1997); *Stearns Co. v. United States,* 34 Fed.Cl. 264, 270 (1995); *City National Bank v. United States,* 33 Fed.Cl. 224, 230 (1995); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386 (1988). *See also Heinemann v. United States,* 796 F.2d 451, 454 (Fed.Cir.1986). As the Supreme Court noted in *Williamson County Regional Planning Comm'n v. Hamilton Bank,* the factors that the court must consider in determining what constitutes a taking "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." 473 U.S. 172, 191, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

Decisions about the ripeness and contours of a takings claim are inherent in implementing the jurisdiction conferred by the Tucker Act. As the Federal Circuit recently explained, "In the course of adjudicating takings claims, the Court of Federal Claims frequently must make determinations as to the scope of a party's property interests, and those determinations often turn on questions as to the meaning of state or federal statutes or regulations." *Del–Rio,* 146 F.3d at 1364. *See, e.g., Preseault v. United States,* 100 F.3d 1525, 1534–37 (Fed.Cir.1996) (in banc); *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995); *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 215–17 (Fed.Cir. 1993); *Yaist v. United States,* 228 Ct.Cl. 281, 656 F.2d 616, 620–21 (1981); *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943, 947 (1979); *Bourgeois v. United States,* 212 Ct. Cl. 32, 545 F.2d 727 (1976). Finality is a prerequisite to the determination of a party's property interests. As the Supreme Court stated in *Williamson:*

> While the policies underlying the two concepts [exhaustion and finality] often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or inappropriate.

*Williamson,* 473 U.S. at 193, 105 S.Ct. 3108.

As the court rules on the ripeness of plaintiffs' claim, it makes a determination mandated by our jurisdiction. This court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia,* 6 Wheat. 264, 19 U.S. 264, 404, 5 L.Ed. 257 (1821). It is no exercise of equitable jurisdiction to assess the finality of an administrative decision for ripeness purposes. Likewise, it is not equity to "make determinations as to the scope of a party's property interests." *Del–Rio,* 146 F.3d at 1364. In fact, it is hard to imagine how value determinations could be

made without looking to the effects of agency action on market value.

In this case, an analysis of the 1996 permits is necessary, not because plaintiffs seek to prevent the enforcement of the permits, but rather because plaintiffs claim the permits do not alter the effect of the 1993 agency decision on their property rights. If neither federal statute nor regulation authorize the 1996 permits, then the permits would have no effect on the ripeness, or extent, of the taking alleged by plaintiffs. If the 1993 denial was a taking, then the 1996 permits, assuming validity, operate after the plaintiff has lost the property right. They may be accepted as a settlement or as just compensation, but as *Whitney Benefits* teaches, they may not be a required compensation that defeats plaintiffs' constitutional rights. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 399 (1989) ("The Federal Circuit held that the mere existence of the exchange provision, a remedy available at plaintiffs' option, did not determine whether or not the statute had effected a taking.").[4]

### B. Whether Plaintiffs Must Concede the Validity of the 1996 Permits

Closely related to the issue of this court's jurisdiction to consider the effect of the 1996 action is the right of plaintiffs to raise the permits' validity in a takings action. The Federal Circuit addressed this issue in *Del–. Rio* where the court stated,

> [w]hile this court has on occasion referred to 'invalid' or 'illegal' government conduct as 'unauthorized' for purposes of determining whether the conduct may give rise to Tucker Act liability, . . . we understand those references to require a showing that the conduct was ultra vires, i.e., it was either explicitly prohibited or was outside the normal scope of the government officials' duties. Neither the Supreme Court nor this court has held that government conduct is 'unauthorized,' for purposes of takings law, merely because the conduct

would have been found legally erroneous if it had been challenged in court.

*Del–Rio,* 146 F.3d at 1363 (citing *Short v. United States,* 50 F.3d 994, 1000 (Fed.Cir. 1995) and *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993)).

The Federal Circuit has made it clear that "a court's conclusion that government agents acted unlawfully does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied." *Del–Rio,* 146 F.3d at 1363. Thus, plaintiffs must concede the validity of the government action that took their property in order to seek just compensation in the Court of Federal Claims. That is the situation here with one twist.

Although a claim for an unauthorized taking could subject the public fisc to actions never intended by Congress, the plaintiffs in this case make no such claim. Plaintiffs state the government action that allegedly took their property was fully authorized. Plaintiffs' dispute is over the validity of government actions that allegedly give the property back. While the plaintiffs "must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act," *Tabb Lakes,* 10 F.3d at 802, the government action granting the 1996 permits is not the basis of that taking claim.

### II. Ripeness

As the Supreme Court recently explained in *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 734, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), there are two hurdles over which a takings plaintiff must pass before a claim is reviewable under prudential ripeness concerns: 1) "the plaintiff must demonstrate that she has both received a 'final decision regarding the application of the [challenged] regulations to the property at issue'" *Suitum,* 520 U.S. at 734, 117 S.Ct. 1659 (quoting *Williamson County Regional*

---

4. This court cites the Federal Circuit in *Whitney Benefits* as holding that:

the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself,

and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act, 28 U.S.C. § 1491. *Whitney Benefits,* 18 Cl.Ct. at 399 (quoting *Whitney Benefits v. United States,* 752 F.2d 1554, 1560 (Fed.Cir.1985)).

**544**

*Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and 2) "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson,* 473 U.S. at 195, 105 S.Ct. 3108. Only the first hurdle, finality, applies here, as the Clean Water Act does not provide a procedure for Just Compensation.

Defendants argue that the 1993 permit denial was not a final decision because it invited plaintiffs to provide more information. The Supreme Court, in addressing the finality requirement, has stated "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury...." *Williamson County,* 473 U.S. at 193, 105 S.Ct. 3108. In *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), the Court made clear that applicants may not claim a taking merely because a permit was denied. Where the applicant could easily modify his application and receive a permit, or seek a variance, the claim is not yet ripe: "Rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive unfavorable reviews." *MacDonald,* 477 U.S. at 353 n. 9, 106 S.Ct. 2561. This court's precedent, however, has held that such variances are not available under these circumstances pursuant to the regulations adopted by the Army Corps of Engineers. *See Loveladies,* 15 Cl.Ct. at 387. *See also Bayou des Familles Dev. Corp. v. United States,* 130 F.3d 1034, 1039–40 (Fed.Cir. 1997). In contrast to the "singularly flexible institutions" of the state described by the Supreme Court in *MacDonald,* 477 U.S. at 350, 106 S.Ct. 2561, the Corps offers neither exceptions, nor appeals.[5] Of course, a landowner may submit new permits every week if she is willing to bear the expense.

The issue before the court is whether plaintiff could have received a permit if it simply provided more information. As this court explained in *Loveladies,* "The requirements of ripeness in the area of Fifth Amendment takings cannot be so extended as to become more exhaustive than the substantive issues presented by the taking claim itself." *Loveladies,* 15 Cl.Ct. at 386. In *Loveladies,* the Court distinguished *MacDonald's* call for "less ambitious" development proposals because the Corps had denied the *Loveladies* plaintiff a fill permit application due to environmental concerns. As a result, less ambitious proposals were unnecessary, because housing development would be "unacceptable per se." *See Loveladies,* 15 Cl.Ct. at 386; *see also Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 157 (1990), *motion to vacate denied by and judgment aff'd by, Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994). That case was an example of the futility exception to the finality requirements of *MacDonald. See MacDonald,* 477 U.S. at 350 n. 7, 106 S.Ct. 2561; *see also Howard W. Heck & Associates v. United States,* 134 F.3d 1468, 1471–72 (Fed.Cir.1998) ("[T]he futility exception simply serves 'to protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.'") (citation omitted).

█ Where it is futile for a party to submit further applications because the applicable law would preclude the agency from ever granting a permit, the agency decision is final. Defendant points repeatedly to the language in the denial letter asking for more information from plaintiffs, and labors to convince this court that it has made good faith efforts to gain this information so that it may grant a land use permit. Its altruism with regard to plaintiffs' property is remarkable; defendant even spent its own money for this purpose, hiring a consultant to discover the

5. As this court explained in *Loveladies,* "[t]here is only one limited exception in which the restrictions of the Act and its attendant regulations can be overridden. This exception occurs in instances where the restrictions may cause a detrimental effect on navigation and anchorage." *Loveladies,* 15 Cl.Ct. at 387 (citing The Water Pollution and Control Act *as amended by* the Clean Water Act of 33 U.S.C. § 1344(b)(2) (Supp. I 1977)).

information it claims was necessary. Of course, this did occur only after litigation began, but one should not question altruism. Defendant then granted plaintiffs a partial "permit" in April 1996, and a complete one in July 1996. Defendant, however, "has not pointed to any procedures in the Corps regulations that permit a landowner to seek either a variance or other analogous relief from the Corps decision."[6] *Beure–Co. v. United States*, 16 Cl.Ct. 42, 49 (1988).

■ The dispositive fact is the denial letter itself. In that letter, the Corps informed plaintiffs that their property was "a valuable wetland resource;" that the proposed development would produce "an unacceptable degradation of [the] valuable wetland resource;" and finally, that "issuance of the requested permit would be contrary to the public interest. Therefore, I must deny the request." According to the governing regulations, "[f]inal action on the permit application is the signature on the letter notifying the applicant of the denial of the permit or signature of the issuing official on the authorizing document."[7] 33 C.F.R. § 325.2(a)(7) (1996). This is clear language, and its import is that even if more information were offered by plaintiffs, they could not have received a permit because of the decision on the merits.

Defendant's claim that it would "elevate form over substance" for this court to follow the governing regulations in its determination is belied by the government's own internal memorandum, which states, "[W]e are not just denying this on alternatives, but also on 25+ acres of wetland loss for commercial use." Def.'s Ex. 60. Where the applicable regulations, the plaintiffs, and the defendant at the time of the denial all suggest there was a decision on the merits, the court must find that there was one. The court is not tempted to overcome the form of the law merely because the defendant had a change of heart after litigation began. "Courts must be sensitive to the constitutional and prudential concerns reflected in the ripeness doctrine, while at the same time being aware that purposeful bureaucratic delay and obfuscation is not a valid basis for denial of judicial relief." *Bayou des Familles Development Corp. v. United States*, 130 F.3d 1034, 1038 (Fed.Cir.1998). In light of the law and the facts, the court finds the Corps' 1993 decision was a final decision on the merits. Any further plans proposed by the plaintiffs would have been "unacceptable per se," *see Loveladies*, 15 Cl.Ct. at 386, because they would have, in the Corps' own words, caused "an unacceptable degradation of [the] valuable wetland resource." Def.'s Ex. 33.

### III. Liability for a Permanent Taking

#### A. Ownership of the Property

Defendant argues that plaintiffs did not own the land continuously because of the quitclaim deed transferring their interest in the property to Jim and Alice Fenning. In a vacuum, this argument might have merit. Instead, there is uncontroverted testimony that the transferred interest, which was returned five days later by quitclaim deed, was intended as collateral for a loan. *See* Trial Tr. at 201–02, 3166–68. Mr. Cooley provided further uncontroverted testimony that he has retained full possession and control of the subject property continuously since 1972. Cooley Tr. at 3164. Also, plaintiffs paid all

---

6. If, as defendant contends, it has the ability under its regulations to issue permits after a denial on the merits because of its power to "revoke, suspend, or modify permits," *see* Def.'s Post–Trial Br. at 70 n. 25 (citing 33 C.F.R. § 325.7), that ability would go to the defendant's claim that it had ended the taking, and not the finality of its initial denial. There is, of course, a difference between the power to revoke, suspend, or modify permits and the power to revoke, suspend, or modify permit denials. The court is not persuaded that an applicant must first seek a "modification" of a denial on the merits before bringing suit in this court when defendant's own witness testified that no statute or regulation provides for reconsideration of the denial. *See* Wopat Tr. at 2616–17, 2840.

7. The Corps' regulations provide an alternative to a decision on the merits, withdrawal of the application, should more information be necessary for the Corps' to reach a conclusion. *See* C.F.R. § 325.2(d)(5) (1996) ("[I]f he does not respond with the requested information or a justification why additional time is necessary, then his application will be considered withdrawn or a final decision will be made, whichever is appropriate."). In this case, there was enough information to make a final decision on the merits based on the wetland status of the property.

taxes and insurance on the land from 1972 up until the taking. *See* Pls.' Ex. 58. Minnesota courts have recognized the intent of the parties when a deed is used to secure a loan, and not for purposes of transferring ownership of the property. *See, e.g., Engenmoen v. Lutroe,* 153 Minn. 409, 190 N.W. 894, 895–96 (1922); *Staples v. East St. Paul Bank,* 122 Minn. 419, 142 N.W. 721, 721–22 (1913). Here, the uncontested testimony establishes plaintiffs intended to retain ownership of their land and intended the quitclaim deed as security for a loan. Accordingly, the court finds plaintiffs owned the land continuously through the loan transaction.

The defendant also disputes plaintiffs' claim of continuous ownership of the land since 1972, because plaintiffs did not possess a warranty title until they had paid off their "contract for deed" in 1981. However, Minnesota law treats the "contract for deed" as a functional equivalent to a purchase money mortgage. *See Gilbert Builders, Inc. v. Community Bank of DePere,* 407 N.W.2d 706, 708 (Minn.Ct.App.1987); *Nichols v. L & O, Inc.,* 293 Minn. 17, 196 N.W.2d 465, 468 n. 7 (1972) ("[T]he relationship of vendor and vendee is analogous to that of mortgagee and mortgagor; i.e., the property is security for the purchase price and the vendor is in effect a lienor."). Thus, in Minnesota, the vendee in a "contract for deed" is entitled to compensation for an exercise of eminent domain, and not the vendor, whose legal title is a mere security interest. *See Summers v. Midland Co.,* 167 Minn. 453, 209 N.W. 323, 324 (1926). Minnesota precedent supports this understanding of ownership of the property in a variety of contexts. *See, e.g., Stiernagle v. County of Waseca,* 511 N.W.2d 4 (Minn.1994) (concluding that vendor is not "owner" of property for homestead classification); *State v. City of Rochester,* 260 Minn. 151, 109 N.W.2d 44 (1961) (determining that vendor is not an owner for purposes of annexation proceeding); *Petition of Brandt,* 241 Minn. 180, 62 N.W.2d 816 (1954) (concluding that vendors are not owners for pur-

pose of statute requiring signatures of 51 percent of owners of land to be crossed by drainage ditch); *Petition of S.R.A., Inc.,* 219 Minn. 493, 507, 18 N.W.2d 442 (Minn.1945), *aff'd, S.R.A. v. Minnesota,* 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946) (concluding that vendee was subject to real estate taxes). In light of this precedent, the court finds that plaintiffs' "contract for deed" constituted ownership of the land for purposes of plaintiffs' Fifth Amendment taking claim.

### B. Permanent Takings

In *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court reaffirmed its principle that the Fifth Amendment is violated when land-use regulation "denies an owner economically viable use of his land." 505 U.S. at 1016, 112 S.Ct. 2886 (quoting *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). Although the Supreme Court's enunciation of regulatory takings was first voiced by Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."), the idea and value which animates the principle announced in *Mahon* is far older.[8]

Property rights have been one of the trinity of fundamental values that has defined our Nation's commitment to the integrity of the person since its founding. The other two pillars are, of course, liberty and life. As the Supreme Court stated, "[i]f, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" *Lucas,* 505 U.S. at 1014, 112 S.Ct. 2886 (quoting *Mahon,* 260 U.S. at 415, 43 S.Ct. 158). James Madison explained in his essay Property, "If there be a govern-

---

**8.** "[F]or what is the land but the profits thereof[?]" 1 E. Coke, Institutes, ch. 1, § 1 (1st Am. ed. 1812). In fact, the Tenth Commandment embodies this same principle ("Neither shalt thou desire thy neighbour's wife, neither shalt thou covet thy neighbour's house, his field, or his manservant, or his maidservant, his ox, or his ass, or any *thing* that *is* thy neighbour's.") (King James) (emphasis in original).

ment then which prides itself in maintaining the inviolability of property; which provides that none shall be taken *directly* even for public use without indemnification to the owner ... which *indirectly* violates their property, in their actual possessions ... the influence will have been anticipated, that such a government is not a pattern for the United States." James Madison, *Property, Nat'l Gazette,* Mar. 27, 1792, *in 14 J. Madison, The Papers of James Madison* 212, 267 (R. Rutland & T. Mason eds.1983) (emphasis in original). The Supreme Court has made clear that such regulations shall not be the pattern under the Takings Clause. *See Lucas,* 505 U.S. at 1028 n. 15, 112 S.Ct. 2886; *see also Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1579 (Fed.Cir.1993) ("Madison's proposed language for the just compensation clause changed during consideration in the First Congress. The changes made the language clearly broader than Madison's proposed version. The Fifth Amendment embraces direct physical invasion as well as other types of Government authorized intrusions.").

■ Where a regulation ends all economically viable use of land, a taking is categorical. *See Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886 (listing the two types of regulatory action that constitute categorical takings as being where the regulation compels "the property owner to suffer a physical 'invasion' of his property" and "where regulation denies all economically beneficial or productive use of land."). By the terms of the Corps' 1993 final decision that plaintiffs' land was a valuable wetland, plaintiffs could no longer develop their property. By the Government's own appraisal the value of the property with a § 404 permit would be approximately $850,000. Both parties agree that the value of the property without a permit is approximately $300 per acre, or approximately $10,000. *See* Pls.' Post–Trial Br. at 60; Def.'s Br. at 14. Thus, at least 98.8% of the property's value was destroyed by the 1993 denial. Under *Lucas,* this constitutes a categorical taking. *See Lucas,* 505 U.S at 1015, 112 S.Ct. 2886; *see also Florida Rock Industries, Inc. v. United States,* 18 F.3d 1560, 1567 (Fed.Cir.1994) (finding that the Court of Federal Claims would be correct to find a

categorical taking where 95% of the economic value of land was lost).

■ In some respects, plaintiffs' situation is similar to the circumstances raised in *Allied–General Nuclear Services v. United States,* 839 F.2d 1572 (Fed.Cir.1988). In *Allied–General,* the Federal Circuit ruled on the takings claim of a corporation seeking an operating license for a nuclear waste reprocessing plant, which it had been induced to build by the federal government. President Carter had ordered the prohibition of such plants for non-proliferation purposes, because other nations might use the plants in the development of nuclear weapons. Four years later, President Reagan rescinded the prohibition. Whatever procedures for appeal existed, they were inherently futile during the period of President Carter's order: "During that period, the taking most likely occurred, if it occurred at all. If it occurred during that period, there is no mystery what the taker took. It took the entire fee." *Allied–General,* 839 F.2d at 1575.

"The Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations." *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 317, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *see also San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 658, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) ("[T]he government entity must pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation."). It would be a contradiction in terms for a permanent regulatory taking to be effected and then rendered temporary without a change in regulation or statute. "Once a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulations, withdrawal of the invalidated regulation, or exercise of eminent domain." *First English,* 482 U.S. at 321, 107 S.Ct. 2378.

Unlike *Allied–General,* this is a case of the government exercising an option that was

not available. Defendant does not argue that the regulations have changed, rather it argues that this court must defer to the agency's seemingly changed interpretation of its regulations in this one case. The court, however, finds that the agency's "interpretation" is actually at odds with its own regulation. While " 'an agency's interpretation of its own regulations is normally entitled to considerable deference,' " *Data General Corp. v. Johnson,* 78 F.3d 1556, 1561 (Fed. Cir.1996) (quoting *Perry v. Martin Marietta Corp.,* 47 F.3d 1134, 1137 (Fed.Cir.1995)), the court is under no obligation to defer to an interpretation that is "plainly erroneous or inconsistent with the regulation." *Honeywell Inc. v. United States,* 228 Ct.Cl. 591, 661 F.2d 182, 186 (1981). In this case, the agency's interpretation is clearly inconsistent with the regulations. The agency itself considered amending its regulations to allow for reconsideration, but it did not do so. *See* 60 Fed.Reg. 37,280, 37,283 (1995) ("[P]roposed rule provides permit applicants with an opportunity to seek a timely and objective reconsideration of an adverse permit decision in a non-judicial forum."). This court can only conclude the regulations still mandate that a decision on the merits is a final decision, as discussed above, even if the agency has changed its mind regarding the finality of the decision in this case only.

From the moment the denial was signed, the right to just compensation vested. "[A]

taking, even for a day, without compensation is prohibited by the Constitution." *Tabb Lakes,* 10 F.3d at 800. In this sense, the right to just compensation is as much a property right as the right to the land that was taken. Just as a state "by ipse dixit, may not transform private property into public property without compensation ..." *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 164, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), or simply declare that a use of land is inconsistent with the public interest, *see Lucas,* 505 U.S. at 1030–31, 112 S.Ct. 2886, the Army Corps of Engineers may not by ipse dixit declare that a permanent taking is now temporary.[9] The regulations have not changed, and the agency's interpretation of its regulations is not tenable as well as tied to its litigating position in only this case. Therefore, the court finds that the government has not rescinded the taking.

Plaintiff urges the court to strike evidence of the 1996 "permits" as settlement offers.[10] While the evidence clearly shows that the only reason for the permits being issued by the Corps (there was no application or request for reconsideration pending) was to avoid plaintiffs' taking claim, the court will not strike them from the record. The agency's own testimony that it possessed enough information in 1993 that it could not honestly deny plaintiffs' application for lack of information, *see* Def.'s Ex.1 60 ("Cooley has provided enough info so we can't deny based on

---

9. Defendant cites dictum from a footnote in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) for the proposition that the Supreme Court "specifically indicated that the Corps may subsequently decide to alter a previous denial of a wetland fill permit application." Def.'s Post–Trial Br. at 51. *See Riverside Bayview,* 474 U.S. at 129 n. 6, 106 S.Ct. 455 ("[W]e do not rule that respondent will be entitled to compensation for any temporary denial of use of its property should the Corps ultimately relent and allow it to be filled."). That footnote, however, makes clear that the Court was not determining what would occur if the Corps were to "ultimately relent," rather it was concerned that a precedent not be set that could be used to decide temporary takings cases, because the Court had not yet determined whether temporary takings required compensation. In addition, the issue of the Corps changing its mind against its own regulations was not before the Court in *Riverside Bayview.* Indeed, the footnote may refer to a change in the

Corps' policy by amending its regulations, not a change in the application of those regulations.

10. Plaintiff also seeks to exclude evidence in certain letters in which the government asks for more information in order to grant a permit and in which Mr. Cooley responds, as settlement communications. Because the court finds that a taking occurred due to the final agency action in 1993 and the agency could not and did not revoke the taking sua sponte, the government's letters have no effect on our decision. The court admitted the government's letters at trial as relevant to the question of whether Mr. Halkowski requested specific information from plaintiffs. The court will not consider Mr. Cooley's letter, Def.'s Ex. 112, which was captioned a settlement communication, for purposes of deciding whether the plaintiffs resumed the administrative process and would not find it sufficient evidence of a renewed application, regardless.

failure to provide adequate info, but it is an agrument [sic] some could make.") shows the denial was not tentative. The circumstances suggest the Corps' search for more information was motivated by a desire to avoid takings liability, rather than an actual need for the information. *See* Wopat Tr. at 2590 (admitting hope that the first 1996 permit would settle the lawsuit); Wopat Tr. at 2749 (noting awareness that second 1996 permit might resolve the litigation). This is a unique fact pattern. Settlement offers are generally not admissible for strong policy reasons. If made in good faith, they might bias the fact-finder. If made admissible, they would be guarded to the point of mere posturing and achieve only sound bites for the trial, not settlement. The interest in consensual resolution of disputes strongly argues for a policy that makes settlement offers inadmissible. It is the same rationale underlying the attorney-client privilege. In this case the alleged permits are also the public actions of a government agency while the potential for prejudicing the fact-finder is greatly reduced because this whole case involves whether a permit denial was a taking. Thus, the court must address whether the issuance of these alleged permits divests the plaintiff of its taking claim.

The court, however, finds that the Corps, notwithstanding the issuance of the 1996 "permits," has yet to issue a permit.[11] Despite defendant's argument that this court does not possess jurisdiction to determine the validity of the 1996 permits, this court surely may take note of whether any permits were granted in the first place. After all, this is the starting point for any takings analysis. Here, the alleged 1996 "permits" state on their third page in bold letters, "PROVISIONAL PERMIT, NOT VALID, DO NOT BEGIN WORK." This situation is analogous to a physical invasion on the land, where the government assures the land owner that it will remove the intrusive object, and then claims that its mere assurances have ended the invasion. "The courts may not accept ... counsel's post hoc rationalizations for agency [orders]." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Although the "permits" are documents created pursuant to agency regulation, their status as permits is a factual issue. Assuming, arguendo, that this court is not able to consider the regulations that declare a decision on the merits is final, it cannot turn a blind eye to evidence that the Corps chose not to grant any permits. Even if the 1996 permits could have been followed by valid permits, the hard fact is that they were not. Based upon the documents themselves, the court determines that no permits were granted, and therefore no rescission of the taking was effected.

Because the taking is by regulation, the removal of the intrusion must follow regulation. A congressionally unauthorized revocation of a taking does not revoke the taking. There is a line between a permanent taking and the moment when a government agency has "undone" the taking, *see First English,* 482 U.S. at 314–22, 107 S.Ct. 2378, as much as there is a line between preliminary government action and a permanent taking. Just as property owners may not be relegated to some limbo where they are unable to use their land nor receive compensation for an indefinite period, they may not be forced to forego compensation subsequent to a taking whenever the Corps feels like reviving the regulatory process, particularly if the renewal of the application is questionable. At the preliminary stage, the line is one of "undue delay." At the post-taking stage, the government must at least follow its own regulations in order to "undo" its actions. The alternative would require piecemeal litigation

---

11. It appears the agency may have sought to buttress counsel's legal strategy by issuing nominal permits without actually permitting development. Mr. Fell, the Corps' project manager, made the following statement in an internal memorandum:

As the case proceeds one thing being looked at is—is there a possibility that some type of permit could be issued for some project at this site. I believe our decision document left the door open because Cooley failed to provide detailed info on a couple of issues. This could be a way to avoid the takings issue.

Pls.' Ex. 162.

While this does not show the agency believed it lacked the authority to issue the permits, it does suggest the agency was not trying to issue a valid permit but rather pursue a litigation strategy.

or otherwise unfair procedures, if, as defendant suggests, plaintiffs are required to reapply following a lawsuit, *see* Def.'s Post–Trial Br. at 76 ("If, at some point in the future, a successful challenge was mounted to the [sic] both of the Corps' actions, upon a suitable remand to the agency, new permits could be issued remedying any defect."). Plaintiffs are entitled to just compensation for a permanent taking of their property, not years of future litigation with the Corps or third parties. They need not choose the government's proposed remedy in district court instead of seeking their just compensation in this court.[12]

## IV. Damages

■ Just compensation for a taking of property "is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'" *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). According to the Supreme Court, " '[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.'" *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (quoting *United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970)). *See also Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1580 (Fed.Cir.1990); *Georgia–Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328, 335 (1980); *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 552 F.2d 343, 347 (1977), *opinion modified on denial of reh'g,* 213 Ct.Cl. 307, 557 F.2d 265 (1977) (all quoting *Almota Farmers,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973)).

Placing the owner in the same position as if his property had not been taken does not mean returning value to him that is unique to that owner. While this might be the rule in a perfect world, assuming such a world had takings, it is not the actual rule. Fair market value is the standard. As the Supreme Court has explained:

> The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variable standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. [L]oss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship.

*Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

### A. Valuation Method

The valuation method used by both parties in this case is called the land development cost approach. This approach looks to the predicted sales revenue from selling the property, as well as the predicted cost to the owner during that time. The plaintiffs' appraisal declared the following "steps:"

1. Develop a plan for the proposed development;

2. Estimate the retail value of the individual lots through an analysis of comparable sales;

3. Estimate the marketing time of each of the lots;

---

**12.** It should be noted that the Supreme Court has concluded that " '[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking.'" *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 11, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194–95, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). The Court goes on to state that it is "[f]or this reason, 'taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.'" *Preseault,* 494 U.S. at 11, 110 S.Ct. 914 (quoting *Williamson,* 473 U.S. at 195, 105 S.Ct. 3108).

4. Estimate the cost of sales, promotion and advertising;

5. Engage an engineering firm to estimate direct development costs;

6. Estimate the indirect costs including real estate taxes and liability insurance;

7. Calculate the holding costs which include the costs of any financing of the direct development costs, and any overhead costs to the developer during construction and sellout;

8. Estimate developer's profit; and

9. The discount rate represents a return on invested capital.

*See* Pls.' Ex. 54.

Plaintiffs argue this method of appraisal, which is the standard one, inappropriately subtracts costs from the value of the property because it includes certain costs to developers. Plaintiffs argue the market in this part of Minnesota is comprised of developers who would not have to pay for most of these costs, and these developers would accordingly value the property at a much higher price. Defendant complains that plaintiffs wish to divide the market into a "submarket," *see* Def.'s Post–Trial Br. at 27, and that, moreover, the buyer in a developer market would seek to make his developer's profit, and not give it to the seller. *See* Def.'s Post–Trial Br. at 28.

## B. Appropriate Market

The need to find objective criteria for market calculation does not mean that a market must be an average one. For example, in *Florida Rock,* the United States successfully argued that the market value of a parcel of land at the post-taking stage must be calculated to include the prices that speculators would pay. Despite the fact that the land at issue could no longer be used for a limestone quarry because of federal regulation, there was evidence that buyers, either through ignorance of the Clean Water Act, or through a long-term investment strategy, would be interested in purchasing the property. These buyers had to be factored into the fair market price: "While an assessor might be justified in adjusting the fair market value figure by discarding aberrational values based upon

sales between related entities or fraudulent sales to widows and orphans, an assessor may not discard an entire market as aberrational." *Florida Rock,* 18 F.3d at 1567.

Naturally, the test for the objective market value of a property is equally valid for both the before and after taking value. Here, there is evidence that developers constituted the market at the pre-taking stage, and the government has failed to refute that evidence. Unlike the land at issue in *Florida Rock,* there is no evidence of a speculators market or an investment market for non-developers. This court, under *Florida Rock,* may not treat that entire market as "aberrational," which is what would effectively happen if the court adopted defendant's position that the developers represent only a "submarket."

However, the court agrees with defendant that it would violate the rule prohibiting compensation for subjective value if the developer's opportunities available to plaintiff were factored into the fair market value, insofar as the developer's opportunities were unique. However, if the market is comprised of developer sales, then *Florida Rock* declares that we may not discard that market as "aberrational." It would not make sense, for example, if every buyer were a developer, to blindly deduct the fees paid to developers in determining market value, merely because some markets, not at issue here, might yield a lower price because the developer fees had to be taken into account.

Defendant, however, claims the developer market would pay the same price as non-developers for the property, despite significantly lower costs to developers. *See* Def.'s Post-trial Br. at 28. While it is true that a buyer who has added efficiencies would not offer a significantly higher price than a buyer who did not have those efficiencies, it is also true that the development cost approach has been adopted as a means of limiting speculative or windfall profits to owners of undeveloped land. As explained in Nichols' The Law of Eminent Domain:

The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving

the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored, and is too uncertain and conjectural to be computed. *In any event, if evidence is offered as to developed value, consideration must be given to the cost of developing that value.*

Julius L. Sackman, 4 Nichols' The Law of Eminent Domain, § 12B.14[1][a] (rev. 3rd ed., 1979) (emphasis added).

### C. Appropriate Valuation

By taking into account the costs of development, a court is able to recognize the highest and best use of an undeveloped parcel of property while at the same time taking into account the reality that, *absent a taking, the property owner would still have to pay money in order to realize his profit.* It is certainly possible that land sold in a market without these costs might draw a greater profit for a buyer developer, and have a higher fair market value because of increased demand and sellers who sought some of the developers' profit. Of course, the developer's profit itself is not a part of fair market value, but may contribute somewhat to that value. *See United States v. General Motors Corp.,* 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945) ("[C]ompensation for [the taking of fee] interest does not include future loss of profits ... or other like consequential losses which would ensue the sale of the property to someone other than the sovereign."); *United States v. Petty Motor Co.,* 327 U.S. 372, 377, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (" '[M]arket value does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, ... [is] refused in federal condemnation proceedings.' ").

To the extent developers are represented in the market, the market price will include a portion of the developers' premium. For example, if 50% of the market is made up of developers, their willingness to pay more for the land, because it is worth more to them, will drive up the marginal price by some percentage of the increased value to them. The amount of premium inherent in the fair market value would be in large part dependent on the number, value and type of developer purchases. Developer's profit, however, is not truly at issue in this instance. Consideration of saved costs in a development cost approach appraisal should not run afoul of *General Motors* any more than calculations of development cost do in this specific context. They are indicia of what unimproved land is actually worth in the market. Indicia intended to avoid windfalls to the property owner, but also to avoid destruction of the owner's investment backed expectations.

The court therefore recognizes that the development cost approach used here may fail to take account of the alleged developer market in this case because the appraiser's guidelines do not permit consideration of lowered costs to developers. As a result, if there were convincing evidence that the developer market in this part of Minnesota indicated a calculable, higher fair market value for plaintiffs' property, this court would grant relief accordingly. Unfortunately, plaintiffs' evidence does not approach this standard.

Assuming plaintiffs' assertion that developers comprise the entire market and assuming that this creates an objectively higher fair market value for the undeveloped land than the appraisers have shown, the court is still limited to the facts before it. In *Florida Rock,* actual offers were used as evidence that the proposed market was not aberrational. Here, no local developers other than the plaintiff have testified to their lower development costs. Mr. Cooley has asserted lower costs for himself, but there is insufficient evidence as to how much lower the costs would be for developers generally, or more importantly, how those lower costs would alter the fair market value. If this court granted plaintiffs' request for $3.2 million, it would have no way of knowing that the remedy was not simply compensation for a "loss to the owner of nontransferable values." *Kimball Laundry,* 338 U.S. at 5, 69 S.Ct. 1434. Plaintiff admits that some of his cost savings were unique to him, and this court will not speculate on the different efficiencies possessed by other local developers-nor the percent magnitude of that market.

## D. Development Cost

There is also significant contention over the development cost appraisals themselves. Defendant's appraisal was based on the costs of improving the soil to building standard from lot-line to lot-line. Plaintiffs' appraisal was based on the costs of improving the soil to parking lot standard, a lower cost proposal. In this instance, the government's figures are unpersuasive. The government conceded that its engineer was instructed "not to consider costs" in his appraisal, *see* Cooley Tr. at 3207–08, and further, the government engineer stated that the parking lot standard used by plaintiff was an acceptable method. *See* Moore Tr. at 1739. The court finds that it was appropriate to calculate costs based upon the parking lot standard for the property in general, because it would constitute a misuse of the development cost approach to inflate the costs to levels which a rational, i.e., cost-avoiding, developer would never pay.

Plaintiffs, however, seek to have defendant's unit prices for development costs struck from the record. This the court declines to do. The plaintiffs' challenges to defendant's presentation go to credibility, not admissibility. Defendant's instruction to their witness not to take cost into account in calculating what soil correction method to use does not necessarily render the witness's testimony unreliable, but merely raises doubts regarding its accuracy in the real market. The court is certainly troubled by the fact that the government expert witness, Mr. Moore, was unable to ascertain precisely how the average prices were determined for soil correction costs because his subordinate lost the paperwork. However, this too is not dispositive, because we know the instructions Mr. Moore gave for how to calculate the averages.

Nevertheless, the court finds the unit prices used by the government lack credibility, in part for the same reasons plaintiff sought to strike them from the record. There are also other reasons. For example, the defendant's witness struck the highest and lowest numbers in his cost calculation, while plaintiffs' used the lowest bid. *See* Def.'s Ex. 7; Frank Tr. at 613–16. These low bids were consistent from one comparable to another, suggesting a reliable method of appraisal. The court is also convinced that it is normal business practice to seek the lowest cost option for soil correction. Other facts in the record also undermine this witness' credibility. For example, the defendant's witness selectively used "comparable" sale prices thus resulting in a lower appraisal value, omitting a 1991 restaurant sale as being "a little bit old," yet accepting other 1991 sales and a sale that occurred the previous year. *See* Strachota Tr. at 1056–57; Def.'s Ex. 34. Moreover, the defendant's witness exhibited an unfamiliarity with the construction and commercial development business when he misused fundamental building terminology ("concrete" versus "cement") and demonstrated a lack of basic commercial development knowledge (the frost line in the area). *See* Strachota Tr. at 974–78; Cooley Tr. at 3202. In short, although this defendant evidence is admissible, it lacks credibility.

However, defendant's appraisal is not entirely without merit. Plaintiffs' engineer, Mr. Frank, conceded that development of the property would require soil correction to building standard for twenty to twenty-five percent of the land. Plaintiffs' calculation, however, does not account for the necessary cost of improving twenty to twenty-five percent of the property to building standard. Because building standard soil correction is necessary to build on the property, any buyer would have to pay for such improvements in order for the property to attain its highest and best use. Although plaintiff argues that such additional costs for the buyer would not significantly affect the sale price, the court finds it less than credible that the property would sell for the same approximate price if the buyer had to make significant soil corrections. Plaintiffs' witness testified that the appraisal was based on a comparables analysis, which takes into account "normal" conditions, and testified that the condition after raising the soil to parking lot level was "normal."

While the court accepts plaintiffs' argument that raising the soil to building standard for the entire property is unnecessary,

and appreciates that a seller would not know which twenty to twenty-five percent to develop, the court finds the sale price would still reflect the need for the buyer to correct twenty to twenty-five percent of the soil. Mr. Cooley's testimony that many of the comparable properties in their analysis posed significant costs to the buyer, including "buried trees, asbestos, demolition of an apartment building" and the like, Cooley Tr. at 3237–38, is insufficient to convince this court that the added soil correction is irrelevant to price.[13] Plaintiffs cannot argue that lower costs for developers should be taken into account, but higher costs for buyers should pass unnoticed. In this instance, the buyers' costs are roughly calculable.

Although the court rejects defendant's unit prices in favor of plaintiffs' unit prices, the court thinks it fair to calculate the added cost to raise the parking lot standard to building standard for twenty to twenty-five percent of the property using defendant's unit prices, given that plaintiff has not proposed any alternative unit price for this purpose.

### E. Fair Market Value

An application of the unit prices used in plaintiffs' appraisal to the government's lot-line to lot-line building standard soil correction plan would cost a developer of the property $2,809,467.00. *See* Pls.' Ex. 134. By subtracting from this number the plaintiffs' $1,312,580.00 appraisal of the cost for parking lot soil correction of the entire property, *see* Pls.' Ex. 134, the court can reasonably calculate the added cost of developing the parking lot standard to a building standard for the entire property: $1,496,887.00. Twenty to twenty-five percent of this added cost would account for the added development cost necessary to bring the property to its highest and best use.

The court thinks a fair valuation would be the median percentage, 22.5%, providing neither a windfall nor excessive cost to a developer within the average range for building

standard soil correction. The resulting development cost is $336,799.58. Subtracting this last number, $336,799.58, from the plaintiff's appraised value of the property, $2,402,-000.00, provides the fair market value for plaintiffs' property: $2,065,200.42.

### CONCLUSION

This court concludes that the Army Corps of Engineers' 1993 denial of plaintiffs' § 404 permit application effected a taking of plaintiffs' property as of February 25, 1993. In accordance with the Fifth Amendment's mandate, this court awards plaintiffs the amount of $2,065,200.42 plus compound interest from the date of taking, as an appropriate measure of just compensation.

The entry of judgment will be stayed pending the determination of attorneys' fees and costs to which plaintiffs are entitled pursuant to 42 U.S.C. § 4654 (1994). Plaintiffs are to file any such claim within 60 days of the filing of this opinion.

**IT IS SO ORDERED.**

---

13. These added costs in the comparables, however, do support the conclusion that it was unnecessary for plaintiffs' appraiser to correct the property to building standard lot-line to lot-line in order to compare to the other properties, contrary to defendant's contention.

