PAX CHRISTI MEMORIAL GARDENS, INC. and Lake County Trust Co., as Trustee under Trust No. 213, Plaintiffs,

v.

THE UNITED STATES, Defendant.

No. 00–717L.

United States Court of Federal Claims.

April 10, 2002.

Todd Richard Wiener, Chicago, Ill., for plaintiff.

Dorothy R. Burakeis, Washington, DC, with whom were Thomas L. Sansonetti, Assistant Attorney General, and Jack K. Haugrud, Chief General Litigation, for defendant.

## OPINION

FIRESTONE, Judge.

This case is brought by plaintiffs Pax Christi Memorial Gardens, Inc. ("Pax Christi") and Lake County Trust Company, as Trustee under Trust No. 213 ("Trust Company"). Plaintiffs allege that the delay and effective denial of a permit to dredge and fill wetlands under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, (" § 404") by the United States Army Corps of Engineers ("Corps") has resulted in a regulatory taking of their property in Lake County, Indiana, under the Fifth Amendment of the United States Constitution. Plaintiffs seek just compensation of at least $10,000,000 for a temporary or permanent taking of approximately fifty acres of wetlands that plaintiffs own as part of their cemetery property.[1] In addition, plaintiffs charge that the Corps' actions regarding their permit application amounted to denial of due process.

The United States ("government") contends that the plaintiffs' takings claims must be dismissed on the grounds that plaintiffs' permit application was withdrawn, and thus there has not been a final permit decision. According to the government, until plaintiffs obtain a final permit decision, their takings claims are not ripe for review. In the alternative, the government argues that, to the extent plaintiffs contend that their permit has been effectively denied on the grounds that the Corps denied a nearly identical permit previously in 1983, their takings claims are time-barred by the six-year statute of limitations under 28 U.S.C. § 2501. The government explains that because the plaintiffs' pending permit application seeks virtually the same permit terms that the Corps denied in 1983, any permanent taking occurred in 1983, when that first permit was denied, therefore starting the statute of limitations clock. Finally, the government argues that this court does not have jurisdic-

tion to consider plaintiffs' due process claims and that those due process claims should, therefore, also be dismissed.

For the reasons that follow, the court finds that the plaintiffs' temporary and permanent takings claims are not ripe for review and must be dismissed. The court also finds that plaintiffs' due process claims must be dismissed for lack of jurisdiction.

### FACTS

**A. Background Facts**

The following facts are undisputed unless otherwise noted. In 1950, plaintiff Trust Company bought cemetery property, known as Evergreen Memorial Park ("EMP"), in Hobart Township, Lake County, Indiana. Pax Christi Memorial Gardens, Inc. is the beneficial owner of Trust No. 213. The Trust, in turn, is wholly owned by Jack Levine and his family.

According to the plaintiffs, the subject EMP property is part of a larger cemetery that was established in 1923. "The cemetery was established and platted in 1923, with subsequent plats of the cemetery in 1925, 1963, 1965, 1973, [and] 1995.... Review of historic aerial photographs clearly indicate [sic] the fill of wetlands for the purpose of creating usable cemetery plots as early as 1938."

After the plaintiffs acquired the property, the State of Indiana built highway I–64 along the cemetery boundary, sometime in 1965. Apparently, I–64 caused periodic flooding of the subject property, but the flooded portion was not yet being used for burials. As in the past, however, the property adjacent to I–64 would need to be filled in for the purpose of creating usable cemetery plots.

In 1973, plaintiffs decided to expand the cemetery to include the EMP's fifty acres, and the area was platted for cemetery use on

---

1. The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without just compensation. U.S. CONST. amend. V. A "regulatory taking" may occur when government action, although not encroaching physically upon or occupying private

property, still affects and limits the property's use to such an extent that a taking occurs. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

March 23, 1973. Beginning in 1977, the plaintiffs began expanding the cemetery into the EMP. Shortly thereafter, in June 1980, the Corps informed plaintiffs that before they could fill in the fifty-acre area, they would need a permit under § 404 of the Clean Water Act, 33 U.S.C. § 1344.[2] Under § 404, the Corps is authorized to grant dredge and fill permits for the purpose of filling wetlands under specified circumstances.

Thereafter, in June, 1983, the owner of the Trust applied for a § 404 permit to fill approximately 43.5 acres with dredged material from the additional 6.5 acres that make up the EMP. On September 23, 1983, the Corps denied the § 404 permit on the grounds that the fill would destroy rare and valuable wetlands and would be contrary to public interest. Specifically, the letter stated that:

> [A] cemetery does not require siting in or proximity to the aquatic environment in order to achieve its basic purpose. The proposed discharge is therefore not permissible under the Section 404(b)(1) guidelines of the 1977 Clean Water Act, since you have not clearly demonstrated that there are no other feasible upland sites in the area for the establishment or expansion of a cemetery.

At the time, neither of the plaintiffs challenged the Corps' denial. Nor did the plaintiffs file an action seeking compensation under the takings clause of the Fifth Amendment. Instead, plaintiffs apparently stopped using the EMP.

Several years later, in June, 1990, the plaintiffs sent the Corps a letter asking for a "wetlands determination" for the EMP. In keeping with its § 404 authority, the Corps examined the EMP area to determine the existence and scope of wetlands subject to permitting. After a site inspection, the Corps notified the plaintiffs, in a letter dated October 12, 1990, that the site contained wetlands subject to the Corps' jurisdiction, and that the plaintiffs would need a permit in

order to fill the wetlands. The Corps enclosed a permit application.

For several years nothing happened. Then, in February 1993, the Trust owner, Mr. Levine, met with the Corps to discuss the § 404 permit process. Notes from that meeting indicate that Mr. Levine was informed that "the submittal of any proposal that does not significantly differ from his previous proposal in 1983 will almost surely result in another denial." The Corps then met with the plaintiffs' consultant, Eric Ellingson, of Earth Source, in September 1993, to again discuss the permitting process.

In connection with the application process, Mr. Ellingson sent a copy of his Wetlands Delineation Report to the Corps, which identified a total of forty-seven acres of wetlands on the site. On October 12, 1993, the Corps confirmed Mr. Ellingson's wetlands determination. Plaintiffs, however, did not submit another § 404 permit application for another two years.

## B. This Litigation

The case currently before this court deals with the plaintiffs' second § 404 permit application. In particular, this court's decision focuses on two letters that were sent by the Corps to the plaintiffs in response to their application; these letters were sent on July 9, 1997, and August 12, 1997. First, a brief description of the procedure to date is appropriate.

On October 31, 1995, Michael Muenich, plaintiffs' attorney at the time, submitted a § 404 permit application seeking to fill approximately forty-one acres of wetlands and to dredge an additional six acres for fill material. Plaintiffs further proposed to use the dredged six-acre area for a detention pond. In all, plaintiffs proposed to impact the entire wetland area, as they had proposed to do in 1983.

In a letter dated December 5, 1996, from the Corps to Eric Ellingson and Michael Muenich, the Corps explained that the appli-

---

**2.** 33 U.S.C. § 1344 provides:

    a) Discharge into navigable waters at specified disposal sites

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

cation was incomplete and that plaintiffs needed to submit additional information or the application would be withdrawn. Neither Mr. Muenich nor Mr. Ellingson provided the missing information. Instead, Mr. Muenich submitted a new application on January 2, 1997. In accordance with the permitting process, once an application is complete, the Corps is required to give the affected public notice and an opportunity to comment on the application. In keeping with the public notice procedure, Muenich provided the Corps with a list of the abutting and adjacent landowners surrounding the property on April 3, 1997.

On May 2, 1997, the Corps issued a Public Notice and request for public comment on the plaintiffs' § 404 application. The Corps received numerous public comments opposing the proposed permit because it failed to minimize adverse impacts or include any mitigation measures. Under the Corps' § 404(b) guidelines, projects that require the use of wetlands may be approved with plans to minimize and mitigate damage to the wetlands. 40 C.F.R. § 230.10(d) ("[N]o discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.") The public comments that were submitted included one from the Indiana Department of Natural Resources, which stated:

> As proposed, this project will result in a direct loss of approximately 41 acres of wetlands. This loss will have significant adverse and cumulative effects on associated fish, wildlife and botanical resources .... It appears that no attempt has been made to avoid or minimize project losses or effects. No mitigation has been proposed to offset wetland losses or the project's direct and cumulative adverse effects. Given this assessment, our agency recommends denial of the permit application.

The United States Environmental Protection Agency also filed comments stating that:

> [In addition to the loss of wetlands], the proposed cemetery expansion itself will be a potential pollution source if groundwater contacts and moves through human remains and storm water runoff from an intensively managed cemetery grounds.... Finally, the record ... is devoid of any attempt ... to minimize the amount of impact or any attempt to compensate for the project's impacts. Accordingly, [we would] ... deny the permit request.

The United States Department of the Interior's Fish and Wildlife Service ("FWS") also commented:

> In addition to providing valuable fish and wildlife habitat, [the subject area, known as Hobart's Marsh] is a significant water storage area.... Therefore, filling and excavation of 47 acres of wetlands would significantly adversely impact hundreds of downstream landowners, public streets, and other facilities.
>
> The applicant has been attempting to fill this marsh since the 1980s.... A copy of the FWS' comment letter of August 18, 1983, is attached for reference, since our position on the proposed project has not changed. The project is not water dependent, there are feasible and prudent alternatives available, and no mitigation for the loss of fish and wildlife habitat and water storage has been proposed. Therefore, the FWS requests that this permit be denied.

On July 9, 1997, these public comments, along with all others, were forwarded to Mr. Muenich for a response. Based on the comments received, the Corps requested additional information on issues "essential prior to a final decision on [the] application." Specifically, the Corps letter stated that more information was needed concerning: (1) whether there is a need for burial plots; (2) whether there are any existing off-site alternatives: and (3) whether there are practicable on-site alternatives that are less damaging to the environment. In particular, the letter solicited the following information:

> b. Purpose and Need. Address the need for the proposed project in terms of burial supply and demand information for the service area.
>
> c. Alternatives. Discuss alternatives to the proposed project.

[T]he issue of alternatives, is critical to our review. The proposed project involves discharges that we must evaluate under criteria known as the 404(b)(1) Guidelines.... The guidelines require a thorough consideration of alternatives and state that no discharge shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem.

Alternatives should include use of other off-site locations which can be reasonably obtained, utilized, expanded, or managed to fulfill the overall project purpose.

If this "avoidance" presumption can be overcome, you should proceed to an analysis of practicable alternatives which minimize damages to wetlands by changes in configuration or construction methods.... You may also propose compensatory mitigation to be considered prior to this step.

The letter requested plaintiffs' response to the specific issues within thirty days from the date of the letter. The letter stated that if additional time was required to gather and submit the information, plaintiffs were instructed to contact the Corps and provide the necessary justification. The letter further informed plaintiffs that, *"[s]hould you fail to provide the requested information, or justify the need for additional time, we may withdraw your application."* (Emphasis added.)

Plaintiffs contend that they had already provided all of the information requested in the July 9, 1997 letter with their permit application. Plaintiffs also assert that plaintiffs' consultant, Mr. Ellingson, had numerous telephone conversations with Charles Simon, the Corps Project Manager, between July 9 and August 12, 1997, disputing the need for additional information. Nonetheless, because plaintiffs failed to formally respond, or to request additional time to respond, by the 30–day deadline, the Corps sent a letter to Mr. Muenich on August 12, 1997, notifying him that, *"[b]ased on your lack of response to date, we have withdrawn your application."* (Emphasis added.)

Plaintiffs claim that despite the alleged withdrawal of the permit, plaintiffs provided the Corps with the requested information eight months later, on April 7, 1998. Although the Corps does not have a record of the response being sent, Corps records reveal that in June 1998 they received a partial response to the questions asked in August 1997. Apparently, while the Corps and Mr. Ellingson had several conversations regarding the response, the Corps did not take any formal action on the application. According to the government, once a permit is withdrawn, the Corps needs a written request to reopen the file, or the applicant needs to file a new permit application.

Although plaintiffs admit that they never formally requested the Corps to reinstate their § 404 permit application, they assert that because their consultant continued to discuss the permit with Corps representatives, the permit application remained open. Plaintiffs contend that Mr. Ellingson last checked on their permit in January 1999. The plaintiffs did not check on the status of their permit application throughout 1999 or 2000. Instead, on November 29, 2000, plaintiffs filed a complaint in this court seeking compensation for either a temporary or permanent taking. The complaint charged that the Corps' refusal to act on the application amounted to a temporary taking, or if the permit is denied, a permanent taking. On July 24, 2001, defendants filed a motion to dismiss.[3] Oral argument was held on March 6, 2002.

### DISCUSSION

### A. Standard of Review

Defendant moved to dismiss this case pursuant to Rules 12(b)(1) and (4) of the Rules of the Court of Federal Claims ("RCFC"), or alternatively, pursuant to RCFC 56. Under RCFC 12(b)(1), a claim must be dismissed if the court lacks jurisdiction over the subject matter. Under RCFC 12(b)(4), a claim must be dismissed if it fails to state a claim upon

---

**3.** While this matter was pending before the late Judge Roger B. Andewelt, the government, at Judge Andewelt's request, provided plaintiffs with an explanation of the steps they would need to take to reinstate their permit application. The plaintiffs elected not to pursue a renewal. They now contend that a final permit decision was in effect made by the Corps in July 1997.

which relief can be granted. RCFC 12(b)(4) further provides that where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." In the instant case, materials beyond the pleadings have been presented by both parties, and those materials have not been excluded. Accordingly, the government's motion will be reviewed as a motion for summary judgment pursuant to RCFC 56.

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for granting summary judgment mirrors the standard for a directed verdict; the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. Federal Rules of Civil Procedure 56(c). Under the standards governing a motion for summary judgment, the court views all evidence in a light most favorable to the non-movant and will draw all reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985).

## B. Plaintiffs' Permanent Taking and Temporary Taking Claims Are Not Ripe

The government argues that plaintiffs' claims for a permanent taking or a temporary taking must be dismissed on the grounds that the Corps' decision to withdraw plaintiffs' permit application was not a final decision on the merits of plaintiffs' 1995 § 404 permit application, and therefore neither taking claim is ripe for review. The government contends that under the precedent established in this Circuit, in *Heck v. United States*, 134 F.3d 1468 (Fed.Cir.1998), withdrawal of a permit for failure to submit all required information is not a decision on

the merits of the application and therefore cannot support a Fifth Amendment takings claim. The government argues that plaintiffs must reinstate the permit process and obtain a final permit decision before any takings claim can proceed.

The plaintiffs concede that their second permit application was "never formally denied." Pls.' Resp. to Def.'s Mot. to Dismiss at 4. Nonetheless, they contend that their permanent taking claim is ripe because the Corps effectively denied their second permit application in its July 1997 letter. The plaintiffs argue:

> There is no question that the 1983 Application, seeking to fill approximately 43 acres, was denied "on the basis that the fill would destroy rare and valuable wetlands . . . ." This was a "final decision." In the July 1997 Letter, the Corps again made it clear that it would not allow development of this [same] "valuable wetland" if the cemetery could be built elsewhere. . . . Of course, there are other properties in northwest Indiana that could be purchased and developed for cemetery use . . . . [4]

Pls.' Resp. to Def.'s Mot. to Dismiss at 10–11 (citation omitted). Thus, plaintiffs contend that since the Corps must apply the same standards in connection with their second permit application as the Corps applied in connection with their 1983 application, the July 1997 letter effectively denied their second permit application.

Plaintiffs argue in a similar vein that requiring them to seek a final agency decision would be futile because "applicable law would preclude the Corps from granting a permit." Plaintiffs state that "the manner in which the 1983 Application was denied and the pronouncements in the July 1997 letter made it clear that no development of the Property would be approved." For the reasons that follow, the court disagrees with the plaintiffs' interpretation and finds that plaintiffs' permanent and temporary takings claims must

---

4. The 1983 permit denial letter goes on to state in conclusion that, "The proposed discharge is therefore not permissible under section 404(b)(1) guidelines of the 1977 Clean Water Act, since you have not clearly demonstrated that there are no other feasible upland sites in the area for the establishment or expansion of a cemetery."

be dismissed on the grounds that the claims are not ripe.

◼ The rules governing ripeness with respect to regulatory takings claims were recently reviewed by the United States Supreme Court in *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). In *Palazzolo,* a landowner filed an inverse condemnation action against the Rhode Island Coastal Resources Management Council ("CRMC"), asserting that the state's wetlands regulations, as enforced by the CRMC, against his property, had taken his property without compensation in violation of the Fifth and Fourteenth Amendments. The Supreme Court reiterated the "important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation." *Palazzolo,* 121 S.Ct. at 2459. The Court explained that, as a general rule, a final agency decision on the merits is required before a taking claim is ripe:

> Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property *depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property* .... As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.

*Id.* (citing *Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 698, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999)) (citation omitted) (emphasis added).

◼ In keeping with these ripeness standards, the Federal Circuit has held that when the government has *withdrawn* a § 404 permit application for lack of necessary information, there has not been a final decision for ripeness purposes. *See Howard W. Heck*

*and Assoc. v. United States,* 134 F.3d 1468 (Fed.Cir.1998). In that case, Mr. Heck wanted to expand an existing residential development in Farmingdale, New Jersey. When Heck failed to receive a § 404 permit, he sued for a taking. The Federal Circuit determined that Heck's taking claim was not ripe for review because Heck's permit application had already been withdrawn by the Corps when Heck failed to obtain the requisite state water quality certificate. Specifically, the Circuit found that withdrawal of a permit application is not a decision on the merits and, therefore a withdrawal decision cannot support a taking claim:

> Because the NJDEP did not determine whether Heck would receive a [water quality certificate ("WQC")], its actions in withdrawing Heck's application for failure to submit all of the required parts cannot be viewed as a decision on the merits. Therefore, the state action of canceling Heck's incomplete WQC application does not constitute a final decision, even assuming it can be imputed to the federal government, and hence it cannot itself support a Fifth Amendment taking claim.

*Id.* at 1472.

◼ The similarity between *Heck* and the instant case is unquestionable. Applying the *Heck* standard to the facts before this court, it is clear that the Corps' express withdrawal of the 1995 § 404 permit application on August 12, 1997, was not a final decision on the merits of the application, but simply a postponement of a final decision until all of the necessary information is submitted. Without this final agency decision, the plaintiffs' Fifth Amendment takings claim is not ripe.

### C. The Corps Did Not Effectively Deny Plaintiffs' Permit Application in the July 1997 Letter, Nor Is Completion of the Permit Process Futile

◼ Plaintiffs seek to distinguish their case from *Heck* on the grounds that the Corps' July 1997 letter effectively denies their application or clearly demonstrates the futility of completing the process at this

time.[5] In particular, the plaintiffs argue that in the July 1997 letter, the government made it clear that they would not consider the proposed project or any modification so long as other non-EMP property is available for cemetery use.

Plaintiffs' reliance on the July 1997 letter is misplaced. When the letter is read in context, it is clear that the Corps did not "finally" reject the proposed project or indicate that it would not consider other less damaging on-site alternatives within the EMP. The Corps' July 1997 letter speaks for itself. With respect to the public interest associated with having adequate cemetery space, it states:

> Address the need for the proposed project in terms of burial supply and demand information for the subject area.

With respect to the alternatives analysis, it states:

> The guidelines define a practicable alternative as one which "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Alternatives should include use of other off-site locations which can be reasonably obtained, utilized, expanded, or managed to fulfill the overall project purpose.

Finally, with respect to mitigation, it states:

> If this "avoidance" presumption can be overcome, you should proceed to an analysis of practicable alternatives which minimize damages to wetlands by changes in configuration or construction methods. The final step in mitigation sequencing is for the Corps to decide upon appropriate compensatory mitigation for any unavoidable impacts. You may also propose compensatory mitigation to be considered prior to this step.

Taken together, there is nothing in this letter to suggest that the Corps has made up its mind not to give fair consideration to all issues. The court cannot simply assume that the government will not fairly consider a completed § 404 application at this time. Indeed, the fact that the 1995 permit application was not denied outright, even though it was very similar to the 1983 permit application, indicates that the Corps is willing to consider changed circumstances from 1983, and alternatives that might accommodate the proposed cemetery expansion project. In this connection, the court also notes that the comments of the Indiana Department of Natural Resources, the United States Environmental Protection Agency, and the United States Department of the Interior's Fish and Wildlife Service, which prompted the request for more information in July 1997, all indicate that a modified proposal that is less damaging to the wetlands and includes mitigation may well be acceptable. Taken as a whole, the Corps' request for information, together with the public notice comments, suggest that a more modest permit application might well be accepted. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 353 n. 9, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) ("Rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews.")

■ The futility exception to obtaining a final permit decision serves "to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved." *Heck,* 134 F.3d at 1472 (quoting *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990)). Where, as here, the Corps has not yet rejected plaintiffs' latest application but has asked

---

5. For the first time at oral argument, counsel for plaintiffs stated that while they believe the Corps permanently took their land, they also believe that they have a temporary taking claim, on the grounds that they now contend that the Corps no longer has jurisdiction over the EMP. because it is an isolated wetland exempt from regulation. Plaintiffs rely on the recent Supreme Court decision *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159,

121 S.Ct. 675, 148 L.Ed.2d 576 (2001), which held that the Corps does not have jurisdiction over isolated wetlands. Counsel for the United States explained at oral argument that the Corps has rejected plaintiffs' claim that the EMP is an isolated wetland and has determined that the EMP is in fact a jurisdictional wetland and therefore subject to the Corps' jurisdiction. In any event, this issue is not properly before the court and has not been considered.

for the information needed to process the application, the court must presume that the government will act in good faith. There is a "high evidentiary burden of proof needed to overcome the presumption that government officials act properly and in good faith." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234 (Fed.Cir.2002).

Indeed, the plaintiffs have not presented any evidence to show that the Corps' request for information in July 1997 was simply pro forma. Plaintiffs claim the § 404 permit application will be denied because the Corps requested more information regarding off-site cemetery alternatives. While the Corps has plainly asked plaintiffs to consider the existence of off-site alternatives, there is nothing in the July 1997 letter, or elsewhere in the record, to show that the Corps has flatly rejected any expansion of the cemetery in the EMP.[6]

Therefore, in contrast to cases such as *Palazzolo,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), where it is clear that the permitting authority has no authority to issue any permit for the proposed use, here, the Corps has the discretion to allow plaintiffs to use a portion of the EMP for cemetery use. It is, therefore, necessary for plaintiffs to complete the 1995 permit application in order for the court to determine the extent of the taking, if any, of the subject property. *See Howard W. Heck and Assoc. v. United States,* 37 Fed.Cl. 245, 252 (1997).

In such circumstances, the plaintiffs' contention that the Corps effectively denied the permit in July 1997, or that completing the process would be futile, must be rejected. Plaintiffs' permanent and temporary takings claims are not ripe and must be dismissed.[7]

## D. Plaintiffs' Due Process Claims Must Be Dismissed

██ In addition to their takings claim, plaintiffs argue in their briefs that their due process claims are ripe. In particular, plaintiffs charge that the Corps violated the Due Process clause in connection with the its handling of their § 404 permit application. The Court of Federal Claims does not have jurisdiction to hear plaintiffs' due process claims. "Although the Fifth Amendment's due process clause provides that no person shall be deprived of property without due process of law, no language in the clause itself requires the payment of money damages for its violation." *Murray v. United States,* 817 F.2d 1580, 1583 (Fed.Cir.1987). *See* 28 U.S.C. § 1346(a)(2); U.S. Const. amend. V; *See also Wright v. United States,* 20 Cl.Ct. 416 (1990). Absent a claim for money damages, this court cannot hear the case. 28 U.S.C. § 1491(a)(1). These claims must therefore be dismissed.

### CONCLUSION

Accordingly, for the reasons stated above, the defendant's motion to dismiss, treated as a motion for summary judgment, is **GRANTED.** Each party to bear its own costs.

---

**6.** In view of the foregoing, the plaintiffs' reliance on *Cooley v. United States,* 46 Fed.Cl. 538 (2000) is misplaced. *Cooley* is plainly distinguishable from the instant case. In *Cooley,* the Corps denied plaintiff's application for a § 404 permit. After litigation was initiated, the Corps indicated that a permit could have been issued for a lesser project. In contrast, the plaintiffs in the instant case rely on the 1997 letter which, on its face, notifies plaintiffs that more information is needed before a final decision can be made. Plaintiffs assert that there was no reason to send more

information, but can point to nothing in the record to show that the Corps was acting in bad faith in requesting the additional information.

**7.** Having concluded that plaintiffs' takings claims are not ripe, the court does not reach the government's alternative argument, that if the court were to conclude the claims were ripe, that the claims would then be barred by the six-year statute of limitations governing actions brought under the Tucker Act, 28 U.S.C. § 1491.